HEYER *v.* KUPS.

CANCELLATION OF INSTRUMENTS—DEEDS—UNDUE INFLUENCE—ACCOUNTING.

In suit by children of grantor, who was old and weakened mentally and physically, to set aside conveyance of property to granddaughter, and for accounting, decree in favor of plaintiffs on ground of undue influence, *held*, justified on record. WIEST, C. J., and SHARPE and NORTH, JJ., dissenting.

Appeal from Wayne; Lamb (Fred S.), J., presiding. Submitted April 23, 1930. (Docket No. 121, Calendar No. 34,964.) Decided October 28, 1930.

Bill by August Heyer and another against Ida Kups to set aside deeds of conveyance and for an

accounting. From a decree for plaintiffs, defendant appeals. Affirmed.

*Wurzer & Wurzer* (*John T. Higgins*, of counsel), for plaintiffs.

*Louis Ott* and *Henry P. Fischer* (*Ray V. Richards*, of counsel), for defendant.

POTTER, J.    Plaintiffs, children of Augusta Kromm, deceased, filed the bill of complaint herein to set aside conveyances made by Augusta Kromm in her lifetime to defendant of the real estate mentioned and described in plaintiffs' bill of complaint, and for an accounting. It is alleged defendant, taking advantage of her relationship with Augusta Kromm, an old lady, weakened mentally and physically by reason of old age, by undue influence, persuaded her to execute the deeds in question and transfer her personal property when Augusta Kromm was feeble in mind and body; that said conveyances were executed without consideration and are void as against plaintiffs. Defendant answered, denying all the material allegations in the bill of complaint.

Augusta Kromm was 78 or 79 years of age at the time of her death, March 26, 1928. She was the widow of Adolph Kromm, who died September 18, 1927. Plaintiff Martha Smith testifies she was on good terms with her mother except when her daughter, Mrs. Kups, defendant, would tell plaintiffs' parents things not true. Adolph Kromm made and executed his last will and testament two or three days before he died. Defendant Ida Kups obtained possession of it, and in the presence of plaintiff Smith burned the will, stating that if anybody knew it they could squeal on her. When it was suggested

her husband might tell on her she said he was so dumb, it is just a piece of paper to him. At the time she destroyed her grandfather's will, she said she could get a different one that was better, and afterward she had a different will but did not show it to plaintiff. After the death of Adolph Kromm proceedings were instituted in the probate court for the probate of his last will. After the probate proceedings were started defendant told plaintiff Smith not to tell Mr. Heyer, the son of Augusta Kromm, the probate proceedings were coming up in the probate court on the 20th, but asked her to represent they were coming up on the 25th, saying, "When they come over there we will have things slipped over on them." Plaintiff Mrs. Smith did not want Mrs. Kups to be the executrix under this will and wanted the Union Trust Company for the reason at that time her mother was blind and feeble and was unable to take care of the collection of the moneys due to her. Her hearing was not good and she could not sign her name. After the death of Adolph Kromm plaintiffs were never able to see their mother alone, and were told that if they went over there somebody would throw them out.

The defendant lived in the same house with Augusta Kromm, living in the back part of the house. When the parties interested in the probate of Adolph Kromm's will got together in the probate court, it was agreed between the attorneys for the respective parties, both defendant and Augusta Kromm agreeing thereto, the trust company should take care of the property and act as administrator of that estate. This was agreeable to Augusta Kromm, and it was there further agreed a guardian should be appointed for Augusta Kromm and that guardian was to be the trust company, so it might

look after the property without representing either one party or the other. It was further agreed that opposition to the petition for the probate of the will of Adolph Kromm was withdrawn, and defendant Ida Kups resigned as executrix of the will of Adolph Kromm and a petition was prepared for the appointment of the trust company as guardian of the estate of Augusta Kromm and signed and executed by Mrs. Smith and by Mr. Heyer, plaintiffs herein, with the understanding such agreement was agreeable to Augusta Kromm and to defendant. At the time this was done, Augusta Kromm was living in the home of her son, August Heyer. Shortly after, she went back to her own home because she was familiar with the house and could get around better than she could in a strange place. The petition for a guardian was sent to or delivered to defendant. She read the petition over to her grandmother and told her grandmother the parties wanted to have a guardian appointed for her to take her property away from her, to put her in the insane asylum, to fix her property so she could not get it, and in other ways sought to prejudice her as much as possible against plaintiffs. There is testimony that Augusta Kromm was not only aged but sick, unable to get around by reason of blindness, mentally disturbed, could not carry on connected conversations, did not transact her own business, was losing her mind, did not know what she was doing, was weak-minded and could not read nor speak English to any extent, and it is the plaintiffs' claim while the old lady was in this mental and physical condition that, taking advantage of her situation and the opportunity which she had to exercise undue influence and in violation of the agreement made between all of the parties at the time of the death of Adolph Kromm, defendant represented,

for the purpose of prejudicing her grandmother against plaintiffs, that plaintiffs were trying to have their mother declared mentally incompetent and have her incarcerated in an insane asylum, and that she did this for the purpose of obtaining the property of the old lady; and that in pursuance of this arrangement she had the savings account which, in his lifetime had been in the name of Adolph Kromm and Augusta Kromm, transferred to the name of Augusta Kromm and defendant, and defendant obtained therefrom September 19th, $363.50; October 31st, $100.50; November 15th, $300; November 17th, $1,500; February 9, 1928, $147.39; March 2d, $145.09, thus closing the account. On November 17, 1927, the date the $1,500 was drawn from this joint account, the same amount was deposited by the defendant Ida Kups in her own name. The record also shows that during the period a considerable amount of money was collected and disbursed on the joint account of Augusta Kromm and Ida Kups, defendant, as follows: November 2, 1927, $175; January 16, 1928, $173.50; April 16th, $172; July 16th, $170.50; October 22d, $170; January 16, 1929, $167.47; April 16th, $165.97, being a total deposit of $1,194.44. Withdrawals from this account were made as follows: November 2, 1927, $10; November 27th, $86.23; January 16, 1928, $83.19; January 17th, $18; January 24th, $17.88; January 31st, $17.70; February 1st, $11.66; February 23d, $25; February 25th, $14; February 28th, $10; March 1st, $10; March 23d, $30; April 5th, $5; April 18th, $137.21; April 20th, $20; April 30th, $10.38; July 6th, $10; July 16th, $5; July 18th, $155; July 24th, $14; October 22d, $53.86; November 2d, $15; November 8th, $26.67; November 15th, $15; November 21st, $21; November 23d, $5; December 11th, $10; December

24th, $15; January 19, 1929, $110; January 26th, $36; January 28th, $19; January 18th, $10; January 26th, $8; April 16th, $156; May 18th, $10, a total of $1,200.78. During all the time that business was being transacted with the bank in which deposits were made on the joint account defendant did the talking and transacted the business with the bank.

The defendant placed a witness on the stand who testified he visited and talked practically every day with Augusta Kromm, had dinner at the defendant's house every day, and Augusta Kromm talked the same as anybody else would, and he took her out riding seven or eight times, and there was nothing to indicate that she was losing her mind. Assuming this is true and that Augusta Kromm was in a normal condition, then there was no reason why the defendant should practice any system of espionage over her or otherwise prevent her from talking and visiting with her own children as the undisputed facts in this case show she did do. There was another witness who testified to substantially the same thing. These witnesses, in the opinion of the trial court, were not considered reliable. These two witnesses, the record shows, have police records tending to show disreputable and criminal conduct upon their part. On the part of the defendant it is claimed the old lady promised to give her this property providing she took care of her. The deeds involved both convey property from Augusta Kromm to defendant. One of them reserves a life lease of the premises conveyed and the other reserves a life lease of the rear portion of the house situated on the lot conveyed, consisting of two rooms, so that when defendant got through with Augusta Kromm she had nothing except a life lease of one of the pieces of the property and a life lease of two rooms

in the rear part of the house on the other property. The trial court set aside the conveyances and directed an accounting be made by defendant. The defendant contends she lived with Adolph Kromm and his wife for some time and took care of both of them in their old age and the property was conveyed to her in consideration of services rendered. The testimony is equally strong that Adolph Kromm and his wife took care of defendant; that defendant and her husband lived and resided in the home belonging to Adolph Kromm and his wife, and the testimony is undisputed that defendant destroyed the will of Adolph Kromm; that when objection was made a conference and settlement was had whereby she resigned as executrix of the will of Adolph Kromm and agreed to join in making a petition for the appointment of a trust company of her grandfather's estate. This proceeding was participated in by Augusta Kromm, by defendant, and by the attorney representing them. After these papers were prepared and signed by plaintiffs, defendant refused to sign them, and, taking advantage of her knowledge of their contents, read them to the old lady and falsely represented to her that plaintiffs were seeking to take possession of her property, have her declared crazy and put in an insane asylum, and by reason of these false representations, Augusta Kromm became prejudiced against plaintiffs. Defendant lived and resided in the home of Augusta Kromm, excluded the plaintiffs from seeing her as much as possible, always had some one else present to listen to any conversation that might be held, so plaintiffs were unable to talk alone with their mother after the death of their father, and defendant thereby insinuated herself into the good graces of her grandmother and obtained from her the personal property which she either expended

or had transferred to her own account, and the deeds in question subject to the life leases contained in each one above specified, so that at the death of Augusta Kromm all of the property, real or personal, which had belonged to Adolph Kromm and Augusta Kromm in their lifetime vested in the defendant to the exclusion of the plaintiffs, the children of Augusta Kromm. The trial judge who saw the witnesses we think arrived at a correct conclusion in setting aside the deeds and directing an accounting. The decree is affirmed, with costs.

BUTZEL, CLARK, MCDONALD, and FEAD, JJ., concurred with POTTER, J.

WIEST, C. J. (*dissenting*). I am not in accord with the opinion of Mr. Justice POTTER.

The bill was filed by a son and daughter of Augusta Kromm, now deceased, to set aside transfers of property by their mother to her granddaughter. Defendant is the illegitimate daughter of plaintiff Martha Smith, and was taken by Mrs. Smith's father and mother when she was five years of age, brought up as their own child, and not informed to the contrary until about the time of her marriage. For upwards of 30 years she lived with, or in a part of the same house with, her grandparents and before marriage served them as their child, and after marriage lived at hand to lend them comfort and help. Plaintiffs, after the death of their father, paid little attention to their mother. It is true that in one place in her testimony Mrs. Smith said the defendant prevented her from seeing her mother, but later she corrected this as follows:

"*Q.* You just told your lawyer that Mrs. Kups told you that she did not want to let you in; you wish to correct it?

"*A.* Yes.

"*Q.* You also told him that every time you went there you got in without trouble?

"*A.* When my father was living.

"*Q.* After your father was dead did anybody tell you to keep out?

"*A.* No.

"*Q.* You went in?

"*A.* Yes. As long as Mrs. Kups was on good terms, if not I never went over there.

"*Q.* You had never been kept out as long as you and Mrs. Kups were on good terms and as long as you were not on good terms you thought the best thing for you to do was not to go there at all?

"*A.* Yes."

The son disclosed by his testimony that he made no serious effort to visit his mother during the last months of her life, and upon this we quote the following from his testimony:

"After my mother left my house after staying there three days, I did not see her until she died or until she was ready to die. I went over three or four or five different times and they said she was asleep. The other reason I did not see her was that the dog was in the house barking at me, and I turned around and went back. I could not get in the house at all. My mother lived with us then three or four days shortly after my father died. From the first of November until my mother died the following March I tried to see her four or five times.

"*Q.* You say you were not able to see her at her home? Mrs. Kups would not let you into the house at all?

"*A.* She said she was asleep one time and the other times there was nobody home and the dogs would bark at me and that is all I know."

This old mother had little occasion to save her small property for her son and daughter, and every reason for giving the same to the grandchild she had raised from a baby, and who had remained at

her side and administered to her needs for many years and up to the time of her death. This old woman was nearly blind, she could not read, was deaf, weakened by rheumatism, had lost her partner a few months before, was grateful for the care given her by her granddaughter and solicitous about having the same continued, and anxious that the granddaughter should have the property and such was clearly the reason for making the transfers. This is not an instance of a stranger moving into the home of an old person and by undue influence or wiles supplanting natural objects of an old woman's bounty, but the case of a granddaughter brought up by the grantor and who continued to live in a part of the same house and care for her grandmother until her death, while one of the natural objects of her bounty did not go near her while at "outs" with her own child, the granddaughter, and the other natural object of bounty called once when his mother was sleeping and later was dissuaded from entering by dog barks. If he had been a frequent visitor, even the dog would have recognized and welcomed him. It is inferred that the defendant put the idea in her grandmother's head that plaintiffs were trying to have her adjudged insane. The idea had sufficient foundation to have been self-engendered. After the death of her father, plaintiff Smith employed an attorney and filed a petition in the probate court asking for the appointment of a guardian for her mother on the ground that she was mentally incompetent. This, of course, by way of citation, came to the mother's knowledge, and it is not strange that she thought her children were trying to have her found insane. The petition was dismissed, but whether voluntarily or not is left in doubt.

This old woman was not mentally incompetent, and the circuit judge so found. The circuit judge

could see no occasion except that of undue influence in the grantor passing her children in favor of her grandchild. I have attempted to point out the reasons why the grandmother wanted the granddaughter to have her property.

It is said that defendant destroyed, by burning, a will of her grandfather and drew another and had him execute it. She did burn a paper drawn many years ago for her grandfather at his dictation, but it was not signed by him and later he made a will which has been admitted to probate. If the old "will" was signed, it was revoked by the later one and a worthless piece of paper. The will of the grandfather is not in the record, but it appears from testimony that the grandmother was given all of the property and defendant was designated as executrix, although not so appointed by the court. The grandmother was given fair notice of the attitude of the plaintiffs toward defendant by way of their objection to having her appointed executrix of the grandfather's estate and their efforts to have their own mother placed under guardianship, and with this in mind she probably thought best to forestall a contest over her estate by passing it during her lifetime to her granddaughter.

It is said: "She (defendant) prevailed upon Augusta Kromm, who had been living with the plaintiff Heyer, to go home with her, to the home that Augusta Kromm and her husband Adolph Kromm had owned during his lifetime." We quote the testimony of the Heyers on this subject. Mrs. Heyer, wife of plaintiff Heyer, testified:

"After Mr. Kromm died Mrs. Kromm came to my place. Mrs. Kups sent her over the night before Mr. Kromm's will was probated, and she stayed with us until the following week on Monday and then she got a bad spell and lay down and cried and got up

and was worried and she said she wished she had not laid down, because she had a bad dream and then she wanted to go back to Mrs. Kups, and we took her back in the evening after six o'clock and then my husband went over again and they made an arrangement that Mrs. Kromm would stay with Mrs. Kups. More than that I cannot say.''

Plaintiff Heyer testified:

''My mother gave as her reason for leaving our house and going back to Mrs. Kups, was that she was more acquainted in her room, she could find herself better than in our rooms. She said I feel more like home in my own room and she thought she had better live in her own house.

''*Q.* And she figured for those reasons that she would go back to Ida?

''*A.* She wanted to live in her own house.''

It is true that the attorney who drew the deeds was not called as a witness, but the reason why he was not called appears in the record. He was sick and instead of taking his deposition, counsel agreed upon what he would testify if a witness.

The circuit judge found undue influence exercised by defendant. We quote from his opinion:

''Mrs. Kups had the opportunity for some time to exercise her influence upon this elderly lady, who, by reason of her age and condition, was more susceptible to influence than she would have been otherwise.

''I am inclined to think from the fact that shortly after the proceedings were taken that this transfer of $1,500 was made from the account of Mrs. Kromm to the individual account of Mrs. Kups without any consideration whatever, that this is indicative of the fact that there was some personal influence being exercised upon the mind of Mrs. Kromm to cause her to proceed and turn over the property, not only the personal property, but the real estate, to the same party, and without any consideration, as a matter of

fact, further than a matter of services, and there is not any proof of that sufficient to justify the turning over of this property on that theory.

"So, I am inclined to take this view of it; that this property should go to the person entitled to the natural bounty of Mrs. Kromm, and to that end the deeds should be set aside, and the estate of Augusta Kromm placed in probate, where Mrs. Kups, if she has any legitimate claim for services, can file her claim in the probate court, and if she can substantiate it, have it allowed, and in that connection I think whatever moneys have been turned over should be accounted for to the administrator of the estate.

"That will justify everybody in getting just what they are entitled to."

Love and affection, care extended, and services rendered by a granddaughter may justly appeal to the bounty of the grandmother, but there is no law under which the granddaughter can have compensation therefor in any court in the absence of a mercenary contract. Mrs. Kromm had an undoubted right to give her property, real and personal, to her granddaughter with or without any money consideration. Mrs. Kromm was mentally competent. She wanted defendant to have her property and gave it to her expecting to be cared for by the granddaughter during her lifetime. The granddaughter cared for her. There is no evidence justifying a finding of undue influence exercised by defendant. It is idle to say that defendant had opportunity to exercise undue influence. Of course she had opportunity the same as any grandchild brought up and living with a grandparent.

I think the decree should be reversed and the bill dismissed, with costs to defendant.

Sharpe and North, JJ., concurred with Wiest, C. J.